Okay, we'll start with our second case. Kellogg v. Watts Guerra, 20-3172 and 20-3257. Mr. Nill, you may proceed. May it please the court, my name is Douglas Nill and I represent the plaintiff's appellants, who I will generally and collectively refer to as farmers. Farmers request that the court vacate the district court decisions in the Kellogg lawsuit in the District of Kansas and direct the MDL panel to return the Kellogg lawsuit to the District of Minnesota. We proceed with these requests, farmers proceed with three separate and independent reasons for these requests based upon three U.S. Supreme Court decisions. Mr. Nill, how does the Supreme Court's decision in lexicon permit this court to review the transfer order, notwithstanding the plain language of the statute of Section 1407E? The lexicon, the MDL transfer statute provides that a improper transfer or what a party believes to be an improper transfer can be challenged through a mandamus petition, which is exactly what I did in this case. I first filed a mandamus petition to the 10th Circuit, it was denied without reasons. I then filed a mandamus petition to the U.S. Supreme Court, it was just denied as a docket order, denied without reasons. But in the lexicon case, the court held that the statute says you can challenge it by mandamus, but you can also then again challenge the transfer or assert an improper transfer after entry of a final judgment, and that's exactly what occurred in lexicon. But in lexicon, the decision to transfer was made by a district court, not by the JPML. It's a decision for the JPML that can't be reviewed except by mandamus, and lexicon didn't involve that. Lexicon, the decision was made by the district court. Well, MDL transfer decisions can be, initially they're made by the MDL panel. The MDL panel transferred the case to the district court judge in the lexicon case. Then you can bring them over. The decision that was being reviewed by the Supreme Court was the decision of the district court to proceed and decide additional issues that it should not have. Am I wrong about that? The error that the Supreme Court reversed in lexicon was an error by district court, not what was pretty much a discretionary decision by the JPML. Well, I think that the MDL transfer decision, the lexicon case stands for the proposition that whether it's the MDL panel or the district court's decision that's being challenged, it can be a challenge through mandamus petition. Once, for example, the MDL panel transfers a case, it's not uncommon for the parties to either, you can either bring a motion to the MDL panel asking that it be sent back or you can bring a motion to the district court. So it doesn't really matter which court you're going under, but the point is that the statute provides for mandamus relief if the litigation is ongoing. But the lexicon case stands for the proposition that once you have an entry of a final judgment, you can challenge that decision again, whether or not it was the district court that made the decision. I don't buy it. The lexicon doesn't stand for something, doesn't stand for a holding that involves a totally different procedural posture, particularly when there's a statute saying that the decisions of the JPML can only be reviewed for mandamus. Unless there's a question, let's go to something else. Did you have a question, Judge Becker? Well, I don't want to be a dead horse, but I shared Judge Hart's, and I don't know if I'd go as far as Judge Hart's would, but my question is somewhat related, Mr. Diehl, and just tell me if I'm misunderstanding. It was not only that the district court transferred the case, because obviously the JPML panel transfers the case to the district court, but then what the district court did was completely contrary to the statute, and that is, it said, contrary to the statute, I, the transferee court, am going to conduct the trial, and I'm going to enter judgment. Well, obviously, under 1291, there is appellate jurisdiction to decide from the disposition of judgment, and so it seems to me that appellate jurisdiction emanated in lexicon under 1291, just like 99.9% of our appeals from the entry of judgment. Now, that certainly is not what happened in Kellogg or really any of the fallout of the Syngenta cases. That was my trepidation about applying lexicon. Well, if I can respectfully respond, what's being challenged here is the improper, the disregard of the language of the MDL transfer statute, and what was challenged in the lexicon case was that the statute provides for the return of the case to the initial transferee court upon completion of the pretrial motion proceedings and discovery, and the district court judge did not comply with the terms of the statute by sending it back to the transferee court, and that's how that case went up to the U.S. Supreme Court. In the Kellogg case, again, it's exactly the same thing. What's at issue is a disregard of the terms of the statute, so the MDL panel disregarded the terms of the statute in sending the Kellogg case. It's a categorical violation. There are no common claims, no common issues, and in fact, once we were sent to the Syngenta MDL, when I tried to actually file a motion to intervene to ask the court to hold the attorney fee awards and expenses in escrow pending resolution of the Kellogg lawsuit, the district court judge in Kansas would not even allow the Kellogg plaintiffs to intervene, so he clearly acknowledged it was a different case than the Syngenta MDL cases, so the lexicon case and the Kellogg case are consistent because both cases were challenging a disregard of the terms of the statute, so then that can be addressed by mandamus during the litigation, and I'm sorry, I'm forgetting to look at the camera. So it's challenging the terms, the words of the statute, and then the lexicon case said what good is the terms of the statute if it cannot be challenged again at the end of the day after entry of final judgment, so I respectfully submit that we're in the same posture as the lexicon case, that we're challenging a disregard of the U.S. Congress edit through the terms of the statute, and so that's a categorical violation of the statute, and it's a judicial usurpation of power in disregarding the U.S. Congress in writing the terms of the statute. Thank you. Thank you. Thank you. So I don't think there's a problem there, but since we're talking about judicial ethics, I thought I should disclose fully my relationship with the expert witness here. That does not mean I have to agree with you, so you can start the clock again. All right. What is it? Tell me concretely what it was that put him in a, put Judge Lundstrom in an impossible, from an ethical point of view, position by taking this case. I don't see, well, I'd like you to explain what it was. Well, of the three Supreme Court cases, we discussed the Lexicon case, the Williams case, and then the Gilboim case. The focus here is on the Williams case. And actually within that context, within the analytic structure, there's three different sort of recusal disqualification issues that are going on here. You have 28 U.S.C. 455A, which are bias or prejudice. Those are really kind of, I hate, don't really like to use the word a dime a dozen, but that's what's most common. You know, somebody says the judge looked at me the wrong way. He doesn't like me. His wife owns some shares of stock, and therefore he must be biased. Those 455A cases are basically, they're speculative. They're allegations of bias or prejudice based upon a speculation that the judge may be biased. Then there's the Williams case, which is really a category of 455B. The Williams case stands for the proposition that a judge who plays a critical role in an underlying proceeding, if the judge played a critical role in the underlying proceeding, there's a substantial likelihood that the judge may be biased. And in the Williams case... Mr. Neal, you're not really responding to my question. You're giving, you're reciting law. I want to know what it was here. You're saying that he couldn't make a proper decision in this case because of his involvement in the other, and I'd like you to pinpoint for me what it was. At what stage he had to make a decision that it would be improper for him to make, and therefore he should have recused. What was it? It's quite clear from your briefs what, at least to me, your discussion of the law, fine, you cite the cases. I'd like to know specifically where Judge Lundstrom was put in an impossible position ethically by taking this case. Thank you, Your Honor. The judge had an obligation to recuse at the time that the Kansas, that the Kellogg case was transferred to him. Why? Because he had played, under the Williams case, he had played a critical role in the underlying litigation, which is the Syngenta litigation. He had allowed the lawyers to privately contract the absent class members, the 60,000 farmers who are my named and putative class plaintiffs in the Kellogg lawsuit. He had allowed the lawyers to privately contract them out of the Syngenta litigation. Now, I don't want to get into, you know, the reality is this is not allowed by the U.S. Supreme Court jurisprudence. It's not allowed by federal rules. So say he made a mistake, say he made a mistake in the underlying litigation. How is that going to affect the decision? Judges make a lot fewer mistakes than, it always surprises me how few mistakes they make, the district judges, given how little time they have to think about things. But they do make mistakes on occasion. At least we think they do. We reverse. And then they retry the case. They're not prohibited from taking further action in the case because they made a mistake about something. How did that mistake, let's assume that was a mistake, how would that play out in making it impossible for him to make an impersonal decision? Why would it influence his later actions in this case? Because I think the mistake is of constitutional significance because the Kellogg lawsuit, it actually sets forthright in the complaint, an amended complaint, that the judge made a mistake. And it's a very delicate position for a lawyer such as myself to be in to point out to a particularly a senior U.S. district court judge that they made a mistake. Well, come on. You tell judges they're making mistakes all the time. That's your job. And judges don't get offended by that. That's part of the job. This is a different magnitude of mistake than saying the judge erred in granting a Rule 12 motion. You're basically saying to the judge you made a mistake because either, A, you were misled by the lawyers, or, B, you facilitated a improper, you know, what we allege to be a racketeering scheme. That's a very delicate place for me to be. And it's a different type of mistake. Well, okay. So how's that going to influence? What decision, then, does the judge have to make in your case that's improperly influenced by, we'll assume, an error by the judge in the underlying litigation? So the judge should have, what you're saying is the judge should have examined this exclusion of the farmers from the class, and that was improper of the judge. That's one question. But, okay, the judge can make that mistake. He said, yeah, I should have looked at that. What effect would that have on your litigation? Again, I was hoping to reserve some time here for rebuttal, but in answer to your question, the 455, there's 455A. 455B are specific requirements where the judge is required to recuse, and in that case, the Kellogg lawsuit alleges that there's a fraud upon the court by the defendant's lawyers and an obstruction of justice in procuring these automatic opt-outs. The judge, therefore, has knowledge of contested evidentiary facts under 455B. There's no way, why would the judge ever have to be a witness? Everything was on the record. Everything that happened was on the record. There's no reason, and it doesn't matter whether he was influenced. The violation is giving incorrect information or failing to provide information to the judge. The weakest of your arguments to me is the argument that he would have to be a witness. You haven't made that case, as I understand it, so far. Well, he may not. That's speculative, but I think it's likely. I mean, there is an allegation that they committed a fraud upon the court. At some point, I think the judge is incumbent upon him to say, look, either I was misled, or what are the reasons why he allowed these automatic opt-outs? These 60,000 farmers were harmed by this, and this occurred on his watch while he was handling this gentle litigation. It's the Williams case. He played a critical role in the – and I'm sorry, I've gone past my time, Judge. Go ahead. He played a critical role in the gentle litigation that creates a likely – objectively likely possibility that he's biased, and that is a standard that has occurred in this case. That's the Williams case. In addition, there's the 455B mandates. If you have knowledge of contested evidentiary facts, he does. Those occurred in a separate case. This is in gentle litigation. There are contested facts in Kellogg. Again, when you look at the – all of this, and Professor Painter addressed this, I think, quite well. The judge has a untenable conflict of interest that as a result violated the due process rights of the Kellogg plaintiffs to proceed with an impartial judge. Judge Lunstrom should have recused. Do any – Judge Rossman, Judge Packrack, any further questions for counsel? I do. Go ahead. I appreciate you indulging me. Mr. Neal, I just want to ask you about an issue of constitutional standing, and I'm going to – I know we're over time, so I'm going to ask some very specific questions. Do you have any – is your argument on the existence of an injury in fact related solely to the six sets of farmers' economic losses? Oh, no. Economic loss – there's two types of injury when there's a legal malpractice type of claim. In the context of a lawyer breaching fiduciary obligations to a client, the injury and the damage is the compensation that is awarded to the lawyer. That relates to a breach of fiduciary type of claim with deceit in this case. If you have an – Okay. So the first answer – and I'm sorry to cut you off, but I am trying to make sure that we're on the same page and don't utilize too much time. So the compensation of the Watts-Garifaux, that is an economic – maybe disgorgement theory, not an economic loss, but a theory of disgorgement of the funds that are compensated to the Watts-Garifaux, right? It's disgorgement, but the Minnesota Supreme Court in one of the Pearl cases specifically referred to compensation as a monetary damage. If you have a challenge to a lawyer, the quality of the work, that's a different type of legal malpractice claim. There the client can have an out-of-pocket loss because of the malpractice. This is a breach of fiduciary duty claim where the monetary damage is the compensation awarded to the lawyers. Okay. And in your opening brief and your reply brief, you talk about the pool allocation error. Judge Lundstrom, in approving the settlement, created – he extinguished the original litigation classes and created a new class in which the six farmers are now a part of to say that you are going to get, between all of you, $100 million roughly, and all of the hundreds of lawyers that participated in the MDL and the individual actions were going to split $500 million. Now, that order was a distinct order of Judge Lundstrom. That's not attached or referred to the Notice of Appeal. You're not challenging that order, right? I mean, you have in the Notice of Appeal that order setting aside $500 million to be allocated between the lawyers. That's correct. The MDL panel, in their transfer, and specifically in the October 3rd order, they recognized the Kellogg as an independent lawsuit. They specifically noted we're not challenging the settlement terms or the fee allocation decisions. We're just saying whatever the lawyers, the defendants in the Kellogg lawsuit, whatever they are awarded, they're required to forfeit that. I think the court is aware. We never appeared in the Syngenta challenging any aspect of the settlement terms or the fee allocation decisions. I'm sorry. I'm interrupting you there. I'm sorry. And so what the judge did is a disregard of the Gelboy case. He went ahead and he dismissed the Kellogg lawsuit claims under Rule 12 based upon his fee award decisions in the Syngenta litigation. And again, what's ironic here is that when we actually tried to intervene in the Syngenta litigation to request an escrow order, he denied our motion to intervene. So he went ahead and he made decisions to dismiss the Kellogg lawsuit claims based upon his fee award decisions in the Syngenta cases. The U.S. Supreme Court in Gelboy says that you cannot do that. I refer to it as a fee allocation pool error. Okay. And I get that. And I mean, I just am answering some pretty specific questions. So let's just stick to those if you don't mind. Okay. Thank you. So, you know, and you say that that's offended roughly 139 years of jurisprudence. Maybe it is. But it's an order that you haven't challenged in the notice of appeal. The order setting aside $500 million that is not going to be allocated among any of the litigants. It's going to be litigated only among the lawyers. And I understand that you strongly challenged that, but you haven't appealed that. And so even if, let's say, we credit your theory or Judge Luxford's theory about Pearl 2, that under Minnesota law, you have this interest of the litigants as a loss in a disgorgement theory. If you win and Waxkera and their Associated Council forfeit their $144 million, your farmers aren't going to get a penny of that. The people that you'll make really happy for all of the other hundreds of lawyers that are fighting over that $500 million. So I don't understand how, even if you have an injury, in fact, how it would be redressable if we credit your theory, because it's all the allocation of that $500 million is all predicated on an allocation order that is not part of this appeal. It's not part of appeal because we're an independent case. We're not part of this injunctive litigation. Exactly. So I guess my question is, if we say every single word of your 70-page brief is absolutely correct, the farmers aren't going to get one penny of the $144 million that Waxkera might have to forfeit. I'm not trying to make an argument. I'm telling you quite candidly, that's where I don't really follow on how you have constitutional standing. I'm not quite sure I understand your question. Let's look at just, for example, the $30 million that's awarded to, recently in the June 4th order, the $30 million that's awarded to Waxkera from their IRPA fund. Now, of course, we're challenging fees that came out of the Minnesota pool and out of the IRPA, but let's just look at that $30 million. That $30 million, they're required to forfeit that back to my 60,000 clients on a pro-rata distribution according to the claims of my 60,000 clients. That $30 million is forfeited back to the 60,000 farmers. That is the compensation Waxkera received. That is the monetary damage of the Kellogg plaintiffs. There's only one flaw in that. It is a prior order that you have a challenge and couldn't challenge, but Judge Lundstrom specifically said that the IRPA pool will be allocated among those lawyers that are representing individuals as opposed to the class litigants, and none of that IRPA pool is to be allocated among any of the litigants. Well, I'm ready to use the word affixion, but it's kind of a fiction that IRPA pool, that money was not created by the district court. That IRPA pool comes out of the common fund. The Kellogg plaintiffs own a pro-rata share of the common fund. That is their money. Whether or not the judge assigned $30 million of that $500 million to the IRPA pool, that IRPA pool is still money, an attorney fee award. It's compensation that goes back to the Kellogg plaintiffs when they prevail in the Kellogg lawsuit. It is a monetary damage. Again, I'm not sure I'm understanding your question respectfully. Okay. Well, I appreciate that. I'll just tell you, you have answered my question, and it was very helpful. So I appreciate it, Mr. Neal, and I apologize to my colleagues for— Judge Rossman, do you have any questions? I do have one, if that's all right. Mr. Neal, I'm trying to reconcile, get a better understanding of all the various orders that are at issue in this case and sort of the consequence for different rulings that we might reach. So let's say for sake of argument that—first, your statutory fraud claims were dismissed, counts four through six, for failing to provide a public benefit, right, required by Minnesota's private AG statute. Okay. So let's say for sake of argument we conclude that the district court made an error under Minnesota law, and we wanted to reverse and remand that claim. How does that work if your entire action was dismissed as a sanction? So in other words, if we agree with the district court that that was an appropriate exercise of discretion, is there anything—is that the end of the road for the whole case? Well, first, I respectfully submit that the sanctions orders were entered during a time that jurisdiction had transferred to the Tenth Circuit. So there's a whole host of issues that are involved there. You know, there's an automatic transfer of jurisdiction. There's a doctrine called— I'm sorry to interrupt you because we're short of time. That's not my question. Let's just—this is entirely just on my assumptions. If the district court's sanctions dismissal is affirmed that that was a proper exercise—we've rejected your argument in my hypothetical, and we've affirmed it, but we agree or find your arguments persuasive on the statutory fraud claims, is there anything that we can do? Can we remand those? Because your action has been dismissed. And I feel there's a tension between those two orders. Can you help me reconcile those? The sanction orders—and I actually referred to this in one of the briefs—the sanction orders look at the end of the story. This is a case where the court has to really look at the start of the story. There's a disregard of the—a categorical violation of the MDL transfer statute. There's a judge who has a untenable conflict of interest that violates due process. They had a mandate to recuse— Mr. Murrow, I'm sorry. I just—it's kind of a yes or no question. Either we can do it or we can't do it. So if we affirm the sanctions dismissal, does that mean that your action is gone and any other rulings that we would be inclined to enter on a remand, if we agreed with your legal arguments, we couldn't do? Is that a correct understanding of the procedure? Well, there's so many levels here. Even the termination sanction— Mr. Mill, your time has expired. Mr. Mill, your time has expired. Okay, thank you. Thank you, Judge. Is Mr. Goodman the lead attorney for Appalachia? Will he be starting? I am, Your Honor. Okay, go ahead, Mr. Goodman. Thank you, Your Honor. May it please the panel, the court, the council. My name is Chris Goodman. I represent Michael Watts, Francisco Guerra, and the Watts-Guerra Law Firm. I have five points to make that resolve all the issues that are raised in the two appeals. The first one, my thanks to Judge Rossman for the segue, is the sanction decision. The case was dismissed as a sanction for litigation misconduct. This court has instructed that when a case is dismissed for litigation misconduct, the court needs to make written findings on the five factors set forth in the Ehrenhaus v. Reynolds case. Magistrate O'Hara analyzed and made written findings on all five of those factors in two orders before recommending dismissal. That dismissal proceeded under Federal Rule of Procedure 37B. Independently, Judge Lungstrom recommended, not only adopted the recommendation of dismissal, but made his own findings under the Ehrenhaus factors favoring dismissal for willful disregard of the court's orders, including not only the failure to participate in pretrial proceedings, but also the plaintiff refusing to pay an attorney fee sanction that was entered to try and, to use Magistrate O'Hara's words, spur opposing counsel to allow pretrial proceedings to commence. That decision is of great deference under an abuse of discretion standard. The district court and the magistrate are in the best position to evaluate the conduct that warranted the sanctions. And if there is no abuse of discretion, then the action has been dismissed. And if the action has been dismissed, then my second point, the second appeal, the denial of the motion to intervene, is moot. This court requires... I thought the sanctions was only on the breach of fiduciary duty claim, that Judge Lungstrom had already rejected, say, the RICO claim for lack of jurisdiction, and had already elsewhere adjudicated all of the other claims. So am I mistaken about that? You are correct procedurally, but my first point that I'm making dovetails with Judge Rossman's point, as I understood it, which is that if the action has been dismissed in total, whether the bucket of claims that existed at the time consisted of breach of fiduciary duty, which was procedurally the case, or the dozen-plus claims that were originally pled, it doesn't matter. A finding of litigation misconduct warranting a dismissal sanction was entered. Unless this court finds that that sanction was an abuse of discretion, and again, it was the recommendation of the magistrate and an independent finding for dismissal by Judge Lungstrom, then everything collapses. There is no underlying claim. There is no live controversy. And so there's nothing for this court to attach jurisdiction to in the second appeal, which is the plaintiff saying in December of 2020, we want to intervene in this agenda MDL. The third point to make is what Judge Bachrach just mentioned. Why were the other claims dismissed? Now, yes, if there's an abuse of discretion on the dismissal sanction, that doesn't revive the whole case. Now we have to look at the 12B6 ruling that Judge Lungstrom made. Those claims were dismissed for failure to plead essential elements of the claim. That's a classic Rule 12B6 violation. Any jurist would have reached the same conclusion as Judge Lungstrom. What was the problem? Number one, pecuniary injury is an essential element of the plaintiff's fraud-based claims. A common law RICO. The plaintiff didn't even allege a pecuniary injury. And Judge Lungstrom points that out in multiple orders. So even if we assume in this lengthy complaint all the allegations are true, there's no actual pecuniary injury establishing a prima facie case. That leaves the three consumer protection statutes Judge Rossman alluded to. Those were dismissed because the plaintiffs failed to plead or convince the court in multiple briefs that their action would benefit the public. In my state, the consumer protection statutes are actionable by the Minnesota Attorney General. But if Joe Q Public wants to seek relief under those statutes, the Minnesota Statute 8.31, the private Attorney General statute, says you have to show that you are acting for the public benefit. Then you can stand in the shoes of the Attorney General and seek relief. The plaintiff didn't establish that either in the allegations or in briefing to the court. And so, again, number one, was there an abuse of discretion in dismissing the case? Absolutely not. We've got three if not four orders analyzing all how the Ehrenhaus factors favored dismissal of the case. But let's hypothetically set that aside. Where does that get us? Well, now we have a 12B6 analysis. That defeats all of the breach of fiduciary duty claims. Now, let's consider where that leads us, if the 12B6 is affirmed. Because, again, essential elements weren't fled. Yes, it's to noble review. But if the allegations aren't there, they're not there. All right, well, that gets into standing. Now, this is a little convoluted. Let me interrupt you to go through a couple of things you've mentioned. When you say the plaintiff's never alleged pecuniary injury, did they seek disgorgement in their complaint? I think that was a prayer for relief. But with respect to your honor, I think we may be talking about two different things. Were the plaintiff seeking a monetary award as a relief? Sure, that's what they were trying to do. But for purposes of standing, but also 12B6, they had to plead that they had actually sustained a pecuniary injury. For standing purposes, it has to be concrete, particularized, imminent. But for purposes of 12B6, they also have to show that that pecuniary injury has been sustained. How does that affect standing in theft of intellectual property cases? Say I have a patent that someone misuses. I can seek disgorgement of their profits. But the fact is I couldn't have made any money on that patent. Their use of the patent didn't hurt me at all because I don't have a business that could utilize that patent to make money. Does that mean that in those cases the plaintiff doesn't have standing? No, but those are standard cases. Maybe I'm probably missing something. But sometimes you have disgorgement claims when you can't show any financial injury to yourself. And I'm understanding you to say if that's the circumstance, then there's no standing. That seems like an important... Well, that concerns me that we would be saying something that would deny that sort of relief in these other statutes, in these other claims. Two points. One, as I was about to explain, the case was initially dismissed March 1, 2019, due to standing. The district court then found that because in Minnesota a breach of fiduciary duty claim, the alleged breach is the injury, that revived the case for purposes of Article III standing. Then the district court did a Rule 12b-6 analysis, and I've just explained what the findings of the district court were on that. With respect to standing, which is my initial response to your question, the case law says we have to have a particularized, concrete, or imminent injury. So in your patent context, if the plaintiff can establish in the pleadings that they have a particularized, concrete, or imminent actual injury, an injury in fact, then they can satisfy Article III standing. In this case... Did the Minnesota Supreme Court essentially say you've heard an injury in this type of case, and there's been a breach of duty by your attorney? The judge apparently said there's no standing and dismissed. Then, in light of the Minnesota Supreme Court decision, decided you did have standing, but the Minnesota Supreme Court decision didn't require a pecuniary injury, did it? Well, respectfully, that was a disagreement that we have with the district court on reviving the case on the basis of standing, because there is no case law in the District of Minnesota or the Eighth Circuit saying that a bare breach of a fiduciary duty claim against an attorney is sufficient to convey Article III standing. But that's a position that the district court arrived at when the initial dismissal for lack of standing was reviewed on plaintiff's motion for reconsideration. So, procedurally, the district court has found, the law of this case from the district court, is that there was standing to proceed and attach federal court jurisdiction because of the fiduciary duty claim. Then the court did a Rule 12b-6 analysis, and the aiding and abetting claim and the fiduciary duty claim survived. The defense then moved to dismiss the aiding and abetting claim again because pecuniary injury was an essential element. The district court agreed, and now the case was ready to move into the pretrial proceedings phase solely on the breach of fiduciary duty claim. That then fell apart due to litigation misconduct and the sanctions for dismissal of the case. Procedurally, that's how we got here. Let me ask again about the, not again, but a separate question about the dismissal sanction. At the time the judge imposed the sanction he did, the only remaining claim was the fiduciary duty claim. Is that correct? Correct, Your Honor. Do we know that he would have imposed that same sanction if there were other live claims in the case? The judge may have thought, you know, if he's got all these other, the plaintiffs have all these other claims, maybe that sanction is a bit harsh. But since all that's left is the fiduciary duty claim, the sanction is appropriate. Can we say that the judge would have dismissed all the other claims as well for the misconduct that led to the dismissal of the fiduciary duty claims? Speculating, Your Honor, my position is that the district court was going to dismiss the case, regardless of whether there was one or a dozen claims remaining. Because in addition to disobeying the court's orders, the plaintiffs had consistently indicated they did not accept the transfer of the case to the District of Kansas. They did not accept the district court's jurisdiction over the case, based on their law divestiture argument. But when you review for abuse of discretion, it's not, we can't say de novo, we would have dismissed everything because of this misconduct. So I just question whether we can say that the dismissal of the whole case indicates that the court would have dismissed everything if the other claims had been live. Let me take another swing at the plate, Your Honor. Procedurally, yes, there was only one claim live at the time the dismissal sanctions were entered. However, the basis for the dismissal, the pattern of conduct, had nothing to do with the type or number of claims that were pending at the time. It was based on the fact that, to use the word obstinate, plaintiffs said in the letter to us after the second attempt at a planning conference and then in a brief to the court and magistrate, you don't have jurisdiction. As an officer of the court, we don't get to pick and choose which orders we're going to comply with. That is anarchy. That creates any attempt at a civil process of resolving claims. There was nothing else for the district court to do, putting myself in that situation, other than do it again and we'll dismiss. That was Magistrate O'Hara's warning. Pay attorney's fees for your vexatious litigation conduct. If after doing that, it's made clear that dismissal is on the table, the plaintiff doesn't play the sanctions, they don't curb their behavior, and then they put in writing, by the way, we're not going to recognize your jurisdiction. Any jurist in that position would say this is an incorrigible, untenable situation. That's the standard, though. That's the standard. Because we don't, I think we'd be very reluctant to, I can tell you, I've canvassed all our case law on this. We'd be very reluctant to affirm on the basis that if the court were exercising its discretion, it would have ruled this way. We'd have to say something like, any reasonable judge would have exercised his or her discretion to dismiss in our case and circumstance. And maybe that's true here. But that's a pretty high bar. One of the area health factors is that the counsel facing the threat of dismissal sanctions was warned. And another factor is that lesser sanctions were imposed to try and curb behavior. The prescriptions, to use a medical analogy from the magistrate and Judge Lundstrom, canvassed every available remedy to curb the behavior. Warnings, military sanctions in order to show cause. And again, not only did the behavior not improve, but the opposing counsel thumbed his nose at the judge. I'm not recognizing your jurisdiction. I will not comply. That just doesn't leave anyone any choice. I think you've made your point. And one reason I regret interrupting what I did is you were continuing with a pretty coherent discussion of the case. But I wanted to make sure about a couple things before you continued. Can you remember where you left off? I did stop at a possible clearance, but I see my time is up. Don't worry about that. Don't worry about your time on that. All right. Can you remember where you were in your presentation? I can't. Okay, good. So we talked about the impact of the dismissal sanction. We entertained where the case would be procedurally if that abuse of discretion was found and the dismissal sanction was vacated in terms of the 12B6. We talked about the finding on standing, which is not the reason why the case was eventually dismissed and why that renders the second appeal moot. But now let's talk about my fourth point, the second appeal. And the district court had three solid bases for denying the motion to intervene. Number one, the motion was brought in December 2020. Counsel made several references to this court today that when they tried to intervene, the district court didn't allow that. Well, keep in mind that at the time the intervention was sought, December of last year, the case had already been dismissed. So there was no right of intervention under Rule 24A. There was no live controversy. Number two, there has to be an interest in the money, and that's the colloquy between Judge Bacharach and opposing counsel. The money, the $1.5 million, ended up in two buckets. $1 billion for the class of which all the plaintiffs are members and by now should have been compensated. Roughly $500 million for counsel. And whether my clients recover an attorney fee or the amount of fee that they recover will have absolutely no bearing on whether the plaintiffs recovered their share of the settlement or the amount. And that was, as an example, one of the fatal findings for purposes of injury, in fact, even hypothetically speaking. And this was... What if their claim was that whatever is awarded to your clients as counsel, that has to be disgorged to the farmers? That gets us into the Pearl cases, and I believe he says most apropos we call the string of Pearl cases. Mr. Deggan gave me that terminology. But the second Pearl case, plaintiff has a $20,000 contingent fee. I think it rolls out of a Dalicon Shield case, and they prove an actual fraud. Under the Pearl cases, you get disgorgement for an actual fraud. If it's a constructive fraud, it's only a nominal award as an aside. Okay, so the plaintiff establishes an actual fraud by the lawyer. The court then disgorges the full fee of $20,000. Why? Because but for the contingent fee relationship, that $20,000 would have gone to the plaintiff. It was diverted. It was intercepted, whatever word you want to use, because of the contingent fee contract. What did Judge Lundstrom do? Abrogated the contingent fee contracts. They don't exist. They are not enforced. They have no bearing on any recovery that any attorney, regardless of whether it's Watger or someone else, has or will recover out of the settlement. And so the Pearl cases are a crude, round hole, square peg fit for what plaintiff is trying to accomplish here. That gets to, I believe, Your Honor, to Judge Hart's point. What happens with the money if there were a basis to deprive Watzger or the defendants in this case of a fee award? Maybe that was Judge Batrack's question. I apologize for not properly giving attribution. The money goes back to the pool. I'll take credit for anything he has. I object to being confused with Judge Hart. But the point is, the point is that if we go down the road of dismissal sanction is vacated and Rule 12b-6 is established and the court doesn't have qualms about standing at all, we get past all these points, and they prevail on the merits, and they secure a judgment entitling them to compensation, well, the Pearl cases, there's no contingent fee relationship. That doesn't give Judge Lundstrom a legal basis under Minnesota law to disgorge fees. It would mean that my clients wouldn't be entitled to a fee. But to Judge Batrack's point, the other sheet doesn't fall. Not only because, again, the Pearl cases don't apply, but the plaintiffs have chosen not to challenge the allocation of the settlement that was preliminarily approved in April 2018 and finally approved December 31, 2018, which is $1 billion for the class, about $500 million for counsel. That's not challenged. So where does the money go if plaintiff jumps through all these hoops and secures a judgment? The money goes back into the pool. The special master would be asked to make another allocation, a sweetener, for the remaining counsel who have already received some fee awards. It's a road to nowhere for the plaintiff in that sense. I ask you, Mr. Judge, do you mind if I ask one question? I was going to ask if you or Judge Rossman had further questions on these matters. I want to ask about Professor's point, but I'll hold off until you ask your question. You go ahead. No, no, no, no. OK. Let's say Professor Payne is the last. OK. So I think my question. I think it is pretty short, but it's on this Pearl 2 issue and your point about the allocation tools that Judge Lundstrom had ordered a long time ago. As I understand Pearl 2, the court was saying, even if apart from the forfeiture of the $20,000 to the lawyer for disloyalty, that there is under basic... ...the client's inability to have independent, conflict-free counsel is, under Wisconsin law, is a cognizable harm. Therefore, it's going to be recoverable as money damages under the liability insurance policy. One of the assumptions of your argument on standing is that, well, you point out, well, Pearl 2 didn't talk about standing. Obviously, it was a state case, so it's not going to talk about Article 3. All those are indisputably true. But on the other hand, there are some circuits. For example, the Ninth Circuit has said that when we interpret case or controversy under Article 3, we do look at cognizable harms that are recognized under state law. So I'm wondering, when the six sets of farmers are in the settlement pool, and Judge Lundstrom is deciding of how much these six farmers are going to get, you said... ...and the plaintiffs say, well, we never got a letter saying that they were terminated. And so their argument seems to be maybe not a perfect, but somewhat of a reasonable fit under Pearl 2... ...when they were trying to decide what to do, if anything, with Judge Lundstrom, when he's divvying up the $100 million among all of these hundreds of farmers, including these six, they didn't have the benefit of independent, conflict-free counsel. And that, under Pearl 2, is a cognizable harm, even in the absence of any economic loss to them. Does that make sense? So my question is whether Judge Lundstrom was...on how Pearl 2 would fit into Article 3 standards. I think I've got my thoughts on three points. One, as I mentioned, although the case was initially dismissed due to standing, the case was revived. So the comments Your Honor made about Pearl establishing standing, it can be interpreted as establishing standing. That is, in fact, what Judge Lundstrom found. Then we moved to the 12B6 analysis. Then we had the dismissal sanction. So that's, in fact, the procedural posture of the case. Our point is the court doesn't need to disturb the district court's findings on sanctions to affirm the dismissal because dismissal was due to the failure to allege essential elements of the claims and then the dismissal sanction. But he shouldn't have done that if he didn't have jurisdiction. I mean, you've argued that Willie didn't have jurisdiction. And as much as you might be attracted to that position, I don't know that we can disregard her obligation under our precedence to see if you're right, if we lack jurisdiction. And if so, we should disturb that dismissal with prejudice and say the whole thing should be dismissed without prejudice because he never had jurisdiction. Yes, and we did raise our argument on appeal for why we disagreed with standing. But that, respectfully, Your Honor, our position is that wouldn't result in a dismissal without prejudice because the case proceeded long enough for the district court and magistrate to both recommend dismissal of the case as a sanction for misconduct. And that was a dismissal with prejudice. And so, hypothetically speaking, let's say the court goes back and says, well, we're not going to address the 12 v. 6 dismissal because we have a different finding on standing. If that was the end of the analysis, then I understand what Your Honor is saying was the dismissal without prejudice. But that's not where the case is. And we can't ignore the fact that although plaintiff disagreed with the court's rulings, as we got into 2020, orders were entered to commence pretrial proceedings, sanctions were issued, warnings of dismissal were made, plaintiffs didn't get with the program, and the case got dismissed. And so, if plaintiffs were thinking, well, we can thread the needle on standing, which, by the way, isn't an argument that they've raised, Judge Bachrach, I'm just responding to your question, that doesn't, that isn't an escape hatch procedurally for this case. The dismissal sanction was with prejudice, and that's a self-inflicted wound that plaintiffs have to take ownership of. With respect to the Pearl cases, the other point I'd make, Your Honor, is that the context your question implies, the recommendations or lack of recommendations from Watts-Guerra after the settlement was preliminarily approved in April 2018, that's not the two categories of injury that the plaintiffs alleged. Their claim is that there was misrepresentations or conduct that occurred long before that, at the time the contract was formed, et cetera. But secondarily, and this is ironic, plaintiff makes much about the Minnesota Rules of Professional Conduct in their briefing. Once Mr. Nill serves my clients with a complaint alleging misconduct, those six or so plaintiffs are in an adversarial proceeding against my clients when we know they're represented by counsel. At that point, neither I nor Watts-Guerra nor anyone else affiliated with them, without running afoul of the Minnesota Rules of Professional Conduct, can now have contact with those clients. So, not that this is what Your Honor's question implied, but we're just hypothetically entertaining the scenario. If it's April 2018, and I'm Roland Bromley, and I'm saying, you know what, I don't think that Watts-Guerra gave me good advice. By the way, they got a full recovery, there's no allegation or argument they did. But let's just, again, we're just assuming that's the case. Self-inflicted wound. How could my client even answer a question? It's a completely untenable dynamic to attempt to maintain an attorney-client relationship when your client has now retained counsel and sued you. We addressed that with some case law in the underlying briefing. But it was an untenable situation. We also got, I'm drawing a blank, I think it was Roland Bromley and one other plaintiff sent a letter to us requesting a copy of their file, and we sent it. But as of April 2018, when Mr. Nill commenced this action, he's the tip of the spear. He's the attorney of record for the plaintiffs. And a related issue, recall Mr. Nill saying we didn't have the right to intervene because the court denied it. As I mentioned, intervention was denied in December of last year because by then the case was dismissed. But if the plaintiffs are moving to intervene, regardless of when that occurred, that is inconsistent with the plaintiff saying earlier to the panel's questions, the judicial panel shouldn't have transferred this tag-along proceeding under 1407. Well, which is it? Plaintiffs can't have it both ways. If it's not a tag-along proceeding, which was one of their positions, then what's the basis to intervene? Setting aside, of course, the fact that the money was sent in two pots and the plaintiffs aren't challenging that order. The last thing I was prepared to talk about was recusal. If the court has no questions about it. I would like to know why you disagree with Professor Painter. I thought there's a possibility that one of the other two counsel here was the expert on that who was supposed to talk. So if you want to palm it off on them, that's fine. But you're going to handle that? Yes, Your Honor. I wear that hat as well. So with respect to recusal, this court in the United States DPA said that information that a court judge learns during related proceedings is not a grounds for recusal under Section 455. And that's a good rule. Because if information that Judge Lungstrom gained while presiding over the MDL disqualified him from presiding over the Kellogg case or other cases transferred, it would defeat the efficiencies of transferring and consolidating actions. And in that sense, would also invite inconsistent rulings. As, for instance, a judge in the District of Minnesota reached a decision contrary to what the MDL rulings said. Plaintiffs never addressed the Page decision in the lower court. Number two, in Calvin B. Rogers, if I'm pronouncing that correctly, this court said that if the evidence, the basis for a request for recusal is speculation or opinion, that doesn't ring the bell. Recusal is not warranted. As Judge Lungstrom found, Professor Painter's affidavit consisted of opinions and was labeled, quote-unquote, pure speculation. I have made a note here while opposing counsel was speaking that when he was pressed about what's the basis for recusal, what's the meat on the bone here. Counsel conflated the allegations and the pleadings with respect to what the defendant attorneys did, class exclusion, double dip, with somehow that satisfying recusal. And there's no nexus there. There's no allegation or argument establishing beyond speculation that the district court was a party to some fraud or aware of this alleged scheme. To the contrary, Judge Lungstrom said two things in his orders. One, disavow any ex parte communications with the defendants, the law care firm, et cetera, but also said that the court believed the representations that there was informed consent for the joint prosecution agreement, but didn't approve it. Judge Lungstrom simply acknowledged that a joint prosecution agreement had been made, but it wasn't adopted with some kind of a finding by the court that would somehow make an opposing counsel. I thought what Professor Painter was saying, though, was that the judge had an obligation, even in terms of fiduciary duty, to the farmers to see if they were treated fairly by this arrangement. So the fact that he didn't do anything doesn't end the argument being made by Professor Painter. In fact, that's the base of his argument, that the judge didn't do what the judge was required to do. Maybe you're making a different point about the judge not needing to be a witness, but I thought that was the heart of the argument by Professor Painter, is that the judge didn't do his duty. It's not clear to me why that would have affected any decision that he would face in the litigation, but your statement that the judge didn't do anything doesn't eliminate the concern Professor Painter raised. I think the response to that, Your Honor, is to look at earlier rulings from the court contemplating dismissal of the case and evaluating the two act classes of wrongdoing alleged, class exclusion and the double dip theory. And the point there is the district court established preliminarily a Lanham Act class and eight statewide classes. Those existed prior to the April 2018 preliminary approval. I'm sorry, let me interrupt. Are you now arguing that the judge did not violate any fiduciary duty by approving the agreement? Or are you going to whether there was a problem with Judge Lindstrom continuing in the farmers litigation, the Kellogg case? I'm establishing, I'm arguing why the district court did not have a basis to recuse based on the opinions that Professor Painter put forth in his affidavit. Because as some earlier decisions from the district court made clear, although the plaintiffs were theoretically members of the Lanham Act class, that class was dismissed on summary judgment. No one will or ever could recover under the class. Second of all, although some statewide classes were preliminarily approved, those classes were number one extinguished when the settlement was preliminarily approved in April 2018. And secondarily, the joint prosecution agreement said that if you're opted out of any classes existing at the time, that's only so long as you're represented by the Watts firm. So once the plaintiffs come in suits against my clients and we have no ability to then communicate with them, they would have been automatically in those classes if they'd existed at the time. But they didn't. They'd been superseded by the one and only class from which anyone will recover. The point of mentioning this, Your Honor, is this additional analysis that your question's implying that we'll show that the district court gone back and evaluated this class exclusion theory. It was already addressed in prior orders by the court. No one's recovering from the Lanham Act class. The plaintiffs wouldn't have been members. Most of them would not have been members of the statewide classes. And those classes were superseded when settlement was preliminarily approved. And so... But what I think, I was so inarticulate when I asked my last question that I don't blame you for not answering it. But I don't think you did. You see, what I gather you're arguing now is that Judge Lundstrom didn't make any mistake with respect to the determining what the class was. The argument by Professor Painter is... And I'd like you to assume Professor Painter's position that Judge Lundstrom didn't do enough in that regard. His point is because the issue of whether Judge Lundstrom acted properly in allowing the determination of who's in the class, that is impossible for Judge Lundstrom to fairly divide the issues in this litigation. So let's say that there's an issue about whether Judge Lundstrom made a mistake in the original litigation. Let's assume he made that mistake. If he did, or if whether he made a mistake is an issue in the farmer litigation, did that make it impossible for Judge Lundstrom to ethically be the judge in the farmer's litigation? Assuming the hypothetical, no, it wouldn't trigger a basis to recuse under Section 455. And actually, the case that plaintiff cites most often for that proposition, Williams v. Pennsylvania, makes that clear. In that case, the judge had been the prosecutor in a case involving the death penalty against a defendant that was later in front of that same practitioner now wearing the robe. Obviously, when that case got to the Supreme Court, and I don't remember if they reversed or affirmed, but the point is, when that was upped on appellate review, the finding, the conclusion was that that's an actual bias. That's 455B, actual bias or partiality. What we're talking about here in terms of Professor Painter, again, to Judge Lundstrom's orders, it's pure speculation because there's no evidence that Judge Lundstrom was aware of any wrongdoing or impropriety, whatever word you want to use to color the allegations against my clients. And so that's why I was saying earlier, what the plaintiff's doing when your honor pressed him on this issue is conflating what my clients allegedly did with a basis for the judge to recuse. Those two don't add up unless there's some kind of a nexus. And there was never anything offered beyond speculation, whether it's the plaintiff or the expert, that Judge Lundstrom was even aware of the misconduct that formed the basis of the case against my clients. And without that, then we're talking about two different things. And that's not sufficient to figure a basis to recuse. There's also a case law in the district that... I'm sorry, go ahead, your honor. I think you've answered my question. Questions from any other member of the panel? Okay, thank you very much, Mr. Goodman. Thank you. I'm sorry, go ahead. My colleagues wanted to address the issue specific to their clients, which we in the brief referred to as the non-retained defendants, so I will mute and let them address that. Thank you. Well, there's no time, and I'm not sure that wasn't pursued by Mr. Neal, so I think we're adequately informed on that issue. Because we went so long, Mr. Neal, do you have anything that you would like to say in addition? If so, I'll give you 30 seconds. You're muted, Mr. Neal. Thank you, Judge. The Watts Fair defendants, they appear in the Syngenta litigation and participated in the fee allocation settlement and fee allocation proceeds only because they had these contingent fee contracts with these 60,000 plaintiffs. They were never class counsel. They're only receiving these fee awards through their contingent fee contracts. That was their ticket for entry into the Syngenta litigation. So any fees that they're awarded under the Pearl cases in compensation, my opposing counsel keeps discussing this. Thank you, your time has expired. Thank you, Judge. Okay. Case is submitted. Counsel are excused.